MIGUEL DE J. RIVERA, Plaintiff and Appellant, *v.* SAN JUAN RACING ASSOCIATION, INC., ET AL., Defendants and Appellees.

No. CE-63-34.     Decided May 18, 1964.

*Arístides Blanco Colón* for appellant. *Hernán R. Franco* for appellees.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

As a prologue to the consideration of the present appeal it is fitting to quote here from Judgment No. 119 of June 10, 1929 of the Supreme Court of Spain (189 *Jur. Civ.* 762), to which we shall refer hereinafter: "Whereas because of the industrial and mercantile development and the expansion and complexity of modern living the juridical relations do not seem to fit squarely within the pattern and nature of the contracts which produce them if such contracts are to be classified, in any event, pursuant to the definitions of the very legal bodies and in line with the former's typical characteristics in their most ample simplicity, for which reason

most of the present agreements comprising heterogeneous obligations and rights determine whatever doubts might exist as to the qualification of the contracts they embody, going then to the correct determination in the qualification and in the declaration of rights and obligations agreed upon as prescribed by the constant decisions of this court before going to the name that the parties may have given to the former, to the spirit underlying them and to the purpose sought by the contracting parties, it being necessary that their intention prevail over all interpretative element when the same is inferred rationally and logically." To endeavor to formulate a classification based on the abstract characteristics of certain juridical figures is not an easy task when the characteristics of the contract respond to social and economic realities of recent development. Friedman, Law in a Changing Society 90–125 (1959). This is precisely the problem we confront in trying to situate—in order to determine the rights and liabilities created between the parties—the agreement which consists in driving a car and leaving it in a parking lot upon payment of a specified amount of money. All that we can affirm, after a survey of the Spanish and North American precedents, is that this contract which we shall label a parking[1] contract is of an atypical[2] nature

---

[1] In the *Diccionario General Ilustrado de la Lengua Española* 742 (2d ed. 1953), a note is inserted after the word *"estacionar"* which reads: "Some Hispano-American countries are given to the use of the barbarism *parkear* (Eng. *to park*) and the substantive *parking. Estacionarse* and *estacionamiento* should be used respectively."

In the *Diccionario de la Lengua Española* (18th ed. 1956) edited by the Spanish Royal Academy, the second meaning of the verb *"aparcar"* (to park) reads: "To leave cars and other vehicles temporarily in a public place assigned for their occupancy."

[2] Puig Brutau comments that the *garage* contract is atypical "because it contains obligations, such as vigilance and custody, which, it is not fair to measure with the strict criterion of the bailment contract, although that is, precisely, the one which regulates the liabilities of the person who assumes a custody engagement." II-2 *Fundamentos de Derecho Civil* 258–259 (Barcelona 1956).

which, depending on the surrounding circumstances, may be classified as a lease contract[3] or bailment for hire.[4]

Before this reality we shall consider the facts of the present case.

On a certain day appellant Miguel de J. Rivera descended from the mountains of Aibonito to enjoy relaxation and amusement by going to the races to be held at El Comandante race track. He went to the races in his automobile, which he parked in one of the areas devoted to that purpose in the premises of the enterprise. He wound up the windows, locked the car, and took the key with him. He paid twenty-five cents to defendant's employee in charge of the parking lot, and, although the enterprise has other employees to indicate the vacant places to the customers—they are called "ushers"—they did not intervene with plaintiff in any manner whatsoever when he parked his automobile. He was not given any ticket or claim check when he paid. At the entrance of the parking area there is a small house occupied by the enterprise's employee. Close to the small house, there is an electric power pole on which a poster is attached visibly and prominently which reads as follows: "Warning—We are not responsible for damages to vehicles parked in our premises or for loss of accessories or personal articles." At the end of the races Rivera noticed that the glass of the right-hand window had been smashed—the deed of an un-

---

[3] On several occasions an attempt has been made to establish an additional distinction depending on whether the owner of the parking lot limits himself to granting permission to leave the vehicle in the parking lot—it is called license—or whether a specific place is designated to park the vehicle—in which case it is qualified as lease, *Millers Mut. Fire Ins. Ass'n of Alton, Ill.* v. *Parker*, 65 S.E.2d 341 (N.C. 1951); *Ex parte Mobile Light & R.R.*, 101 So. 177 (Ala. 1924), but it is not necessary to refer to said distinction because the same result is obtained as to the liability for damages.

[4] Although the concept of "bailment" in Common Law is more ample than that of depositum in Civil Law, Puig Brutau, *op. cit.* at p. 444, for the purpose of the discussion it is not necessary to refer to their distinctions.

known third person—and the radio, which was installed in the vehicle, as well as a mat, had been stolen.

Appellant filed a complaint which he entitled breach of contract against San Juan Racing Association and its general manager, Henry B. Wessel, Jr., in which he alleged that on the date stated "he was a guest at the race track . . . and he *leased* a space for parking vehicles"; that he paid the amount required for "the care" of his vehicle; and he claimed the amount of $233.00, for the damages suffered on account of the lack of vigilance on the part of defendants. Defendants denied the essential facts and filed as special defenses, among others, that (1) they had not accepted liability for losses which occurred as a result of the stealing of articles left in the vehicle, nor for the damages caused to the same; and (2) they had not agreed to watch or take care of the vehicle or the articles which might be inside the automobile. The District Court, Río Piedras Part, sustained the complaint; on appeal, the Superior Court, San Juan Part, reversed the judgment because it was of the opinion that from the facts stated it did not appear that defendant had committed *negligence.*

■ 1. We need not elaborate to indicate the difference between the juridical nature of the lease and bailment contracts. The rights and liabilities which arise from both, the purposes they pursue and the moment of their perfection and consummation in the light of the legal provisions applicable[5] determine their fundamental differences; (a) a lease is a consensual contract for in the case of things one of the parties binds himself to give to the other the enjoyment or use of the thing for a sum certain and a fixed term; the bailment is real, because it is constituted from the time a person receives a thing belonging to another to be held and returned; (b) in the lease, the giving of the use is essential;

---

[5] Sections 1433 and 1658 of the Civil Code (ed. 1930), 31 L.P.R.A. §§ 4012 and 4621.

in bailment, the receiving and holding of the thing by means of an effective transfer of possession is the distinctive re- ·quirement. As Puig Brutau states, *op. cit.*, pp. 441 and 442, in a lease the obligation of custody is subordinated to another obligation or principal ·juridical relationship, the enjoyment of the thing, while in bailment the obligation of custody appears autonomous in nature, it is the essence of the contract itself. Graphically he says: "In one case it is held to be delivered and in the other it is delivered after it has been held." 4 Castán, *Derecho Civil Español, Común y Foral* 237 (8th ed. 1956); 3 Borrell and Soler, *Derecho Civil Español* 427 (1955); IV-II Puig Peña, *Derecho Civil* 202 and 418 (1951).

The importance of the distinction, whether the contract is considered lease or bailment, is that the lessor is only bound to deliver the parking space in the proper manner for its use and see that it is kept in the proper condition for its use, while the bailee is bound to hold the parked automobile and exercise every positive act that is necessary to preserve it and protect it from danger. It is fitting to state herein that the bailee's liability in relation to the holding and loss of the thing is not governed by any concrete rule; upon making a decision he must refer to the provisions which generally regulate the performance of the obligations— § 1666 of the Civil Code, 31 L.P.R.A. § 4661—to the rules stated in §§ 1054 to 1057 of said code, 31 L.P.R.A. §§ 3018 to 3021: he is liable not only for deceit, but also for negligence, that is, the omission of such diligence agreed upon by the parties, or in default thereof, that observed by a good father of a family.[6]

---

[6] In general terms, when the relationship between the owner of the vehicle and the operator is qualified as bailment the courts have acknowledged the existence of a presumption of negligence once it is established that the delivery to the bailee was accomplished and the automobile was lost or suffered damages while it was under the control of the attendant of the parking lot. *Presumption of Negligence of Parking Lot Owner for*

The consideration given by the Supreme Court of Spain to a similar situation is interesting. In the judgment mentioned at the beginning of this opinion it was sought to qualify the contract executed with the owner of a garage to keep an automobile which was destroyed as a result of a fire. The Court said:

"The act of carrying and storing an automobile . . . upon payment of 250 pesetas per day, without there being agreement or special clauses, constitutes a lease of space comprised in the definition in § 1543 of the Civil Code [§ 1433 of Puerto Rico] although the lessor may have the implicit obligation of the vigilance and custody of the automobile, in general terms, because it was stored in a public garage together with other automobiles which were or could be there, the owners or agents being free to go in and out and perform the operations proper of said vehicles."

And to point out the characteristics which preclude its qualification as bailment, it adds:

"Whereas this obligation of vigilance and custody of the stored automobile does not alter the nature of the lease contract of garage space by converting it into a bailment of the automobile, for in favor of the first qualification the object pursued is to keep the automobile inside the garage, which object, unless otherwise expressly stipulated, is none other than that of holding it while it is out of operation, *without the owner transferring its possession to the garage*; the subsistence of the contract because the car was again put in the garage, after the owner had taken it out as often as he desired, which contradicts the nature of the bailment, the use of which is not acquired, it failing to be for a term in keeping with the necessity of holding and preserving the thing, which may be established for an indefinite term as against that which is essential in the lease con-

*Damage to Parked Car*, 14 Stan. L. Rev. 200 (1961). See *Castorina* v. *Rosen*, 49 N.E.2d 521 (N.Y. 1943), and commentaries in 16 Alb. L. Rev. 80 (1952) and 14 B.U.L. Rev. 368, 372–373 (1934).

As to the presumption in case of lease, see *Cabinero* v. *Cobián; Hanover Fire Ins. Co., Int.*, 81 P.R.R. 926 (1960); *cf. Goenaga* v. *West Indies Trading Corporation*, 88 P.R.R. 847 (1963).

tract pursuant to § 1.543 of the Civil Code [1433 of Puerto Rico], it being repugnant to the logic of the actions that bailments be created and cancelled, in the lapse of one day as many times as the automobile goes in and out of the garage; the smallness of the fee charged, as well as the uniformity, so disproportionate for the first concept with the hazards and obligations for which the owner of the parking lot would be liable if he partook of the nature of bailee and the absence of relationship with the value of the thing, payment being alike for watching a high-priced vehicle of special qualities as for a low-priced car of medium manufacture and inferior elements, which circumstances as a whole reveal reasonably and logically, in the absence of proof of a special agreement of bailment of a Delage automobile, that the contract at bar was nothing more than a lease of a garage space to preserve said automobile while not in use, and such was the intention of plaintiff and defendant when they made the agreement."

Castán and Bonet Ramón consider correct the previous decision and state that "The element of custody is very ambiguous and intervenes as accessory in many contracts, without altering them,"[7] relying on Fubini who states that only in the event that said element constitutes the cause of the juridical relationship can the contract be qualified as a bailment.[8] In relation to the liability of garage owners in case of automobiles destroyed by fire while stored under their custody, see *Reimer* v. *Petersen*, 22 N.W.2d 817 (Iowa 1946) and *Zucker* v. *Kenworthy Bros.*, 33 A.2d 349 (N.J. 1943).

---

[7] XVIII *Revista de Derecho Privado* 380 (1931).

[8] The contract of guarantee to safe-deposit boxes has been considered as a lease grounded on the availability on the part of the holder and the absolute ignorance of the banks about the manner in which the client uses said box, which preclude the qualification as bailment unless the client makes an actual delivery of the contents of the box to the bank. The judgment of December 14, 1928, 186 *Jur. Civ.* 586. See, moreover, the judgment of April 21, 1933, 208 *Jur. Civ.* 682.

The coat room contract—delivery of some things by a spectator for their keeping and custody until he claims them at the termination of the show—is qualified as bailment. Pascual Nieto, *Los contratos de espectador y guardarropas en los cinematógrafos,* 8 *Revista General de Derecho* 2 (1952).

*Cf. Panhandle South Plains Fair Ass'n* v. *Chappell,* 142 S.W.2d 934 (Texas 1940).

An examination of the cases decided in the United States show that the qualification of the relationship existing between the lot proprietor and the owner of the automobile depends, in the last instance, on the manner the parking lot in question is being operated. The determining factor is usually whether or not the actual delivery of the vehicle has occurred. The delivery required is not proved by merely parking in one of said areas; it is necessary to establish not only that the lot proprietor has obtained the possession, but also the effective control of the vehicle. In *Weddington* v. *Stolkin,* 106 N.E.2d 239 (Ind. 1952), it is mentioned that generally there must be such a full transfer as to exclude even the possession of the owner himself and of all other persons. Said element of exclusion of the possession is the distinctive element for the purpose of imposing liability on the operator of the area as bailee. In the absence of said element it would be sustained that he only leased a parking space.

Several factors have been considered to determine the presence of said effective control: (1) whether or not the area is fenced;[9] (2) if it is, whether the entrance and exit have been provided; (3) the number of employees and the functions performed by each, especially in relation to vigilance; (4) whether or not a ticket is delivered as a

---

[9] Apparently, such cases, where the owner of a vehicle has no choice as to whether or not to use the parking area, as in the airports, are subject to special consideration in relation to the imposition of liability for damages. Said premises could be denominated "prescribed" lots. *Nargi* v. *Parking Associates Corporation,* 234 N.Y.S.2d 42 (1962), commented on in 20 Wash. & Lee L. Rev. 362 (1963), which was decided on the ground that it constituted *negligence*: (a) the failure to fence the area properly, and (b) failure to take the necessary precautions to safeguard the vehicles, under the concurrent circumstances, were not compatible with the proper care. Notice that the liability was imposed irrespective of the nature of the agreement between the parties.

means of identifying the vehicle upon leaving the area, or for the sole purpose of computing the fee charged;[10] (5) whether the owner of the automobile locks the vehicle and keeps the key, or whether, on the other hand, leaves the keys in the car or with an employee; (6) whether the owner parks the vehicle himself, the employee limiting himself to designating the place to park, or in default thereof, whether the vehicle is delivered to the employee at the entrance to be parked by said employee or his assistants.

▬▬ There is no inflexible rule applicable in such cases. Therefore, the decision in relation to the conflict of interests between the parties depends, in the absence of legislation or special agreements, on the importance attributed to this aggregate of factors or to those within the particular circumstances of each case. However, it can be affirmed that where the operator, through his employees, collects the fee, but merely designates the place to park the vehicle and the owner of the automobile retains the control of the vehicle, locking it or not, and keeps the key, no actual transfer of the property has taken place to justify the establishment of a bailor and bailee relationship. Now then, when in addition to collecting the fee, the operator of the area undertakes to park

---

[10] Regulation No. 16 approved on September 9, 1963 by the Economic Stabilization Administrator, 23 R.&R.P.R. § 734–751 *et seq.*, establishes the maximum rate per hour applicable to parking lot services in open areas. Said rate depends *exclusively* on the space of time the service is used. The study verified by said agency consistently refers to the "consumer", and in the examination of the different factors of expenses for operation, consideration is only given to the value of the lot or rent paid for it and the wages paid to the employees.

The Senate Industry and Commerce Committee has recommended to said body the approval of Senate Bill No. 606, which, among other things, authorizes the Economic Stabilization Administrator to require minimum standards of safety and personal convenience for the clients, visitors and employees of the parking areas, and "the undertaking of due guarantees by means of insurance or any other appropriate manner, for the compensation for damages that persons who attend such parking lots for motor vehicles may suffer, *including the damages suffered by their vehicles and other belongings.*"

the car, or requires the owner to leave the keys so as to be able to move the vehicle, and in addition tickets or claim checks are issued as a means of identifying the cars for re-delivery, the existence of a contract of bailment is admitted. The annotation *Liability for loss of or damage to automobile left in parking lot* which appears in 131 A.L.R. 1175 (1941) cites the cases on the matter. Jones, *The Parking Lot Cases*, 27 Geo. L.J. 162 (1938), probably contains the best exposition in relation to said matter and it has been frequently cited by different courts in the United States. To complement the authorities cited, see the following cases decided after 1941: *Farley* v. *Sley System Garage, Inc.*, 144 A.2d 600 (Pa. 1958); *Tammelleo* v. *Solomon*, 66 A.2d 101 (R.I. 1949); *Malone* v. *Santora*, 64 A.2d 51 (Conn. 1949); *Quinn* v. *Milner*, 34 A.2d 259 (D.C. 1943); *Rea* v. *Grant-Long Co.*, 155 N.E.2d 724 (Ohio 1957); *Duffy* v. *Cleveland*, 138 N.E.2d 307 (Ohio 1956); *American Automobile Ins. Co.* v. *Dayton Parking Co.*, 79 N.E.2d 687 (Ohio 1947); *Schwartz* v. *Felman*, 79 N.E.2d 355 (Ohio 1947); *Agricultural Ins. Co.* v. *Constantine*, 58 N.E.2d 658 (Ohio 1944); *Heafner* v. *Hill*, 57 N.E.2d 759 (Ill. 1944); *O'Brien* v. *Isaacs*, 116 N.W.2d 246 (Wis. 1962); *Dennis* v. *Coleman's Parking, etc.*, 2 N.W.2d 33 (Minn. 1942); *Schulze* v. *Allison*, 227 P.2d 658 (Okla. 1950); *Southern Aereo, Inc.* v. *Jordan*, 116 S.E.2d 304 (Ga. 1960); *Elliot* v. *Levy*, 49 S.E.2d 179 (Ga. 1948); *Loeb* v. *Whitton*, 49 S.E.2d 785 (Ga. 1948); *Nuell* v. *Forty North Corporation*, 358 S.W.2d 70 (Mo. 1962); *National Garage* v. *Barry*, 232 S.W.2d 655 (Ark. 1950); *McAshan et al.* v. *Cavitt et al.*, 229 S.W.2d 1016 (Texas 1950); *Carothers* v. *Moore*, 183 S.W.2d 987 (Texas 1944); *Old Hickory Parking Corp.* v. *Alloway*, 177 S.W.2d 23 (Tenn. 1943); *Lewis* v. *Ebersole*, 12 So.2d 543 (Ala. 1942), in which it was maintained that the facts justified the existence of a contract of bailment; and *Park Rd. Parking* v. *Consolidated Mut. Ins. Co.*, 168 A.2d 900 (D.C. 1961); *McFarland* v. *C.A.R. Corp.*,

156 A.2d 488 (N.J. 1959); *Travelers Ins. Co.* v. *Pond,* 143 N.E.2d 189 (Ohio 1957); *Giles* v. *Meyers,* 107 N.E. 2d 777 (Ohio 1952); *Burcham* v. *Coney Island,* 94 N.E.2d 280 (Ohio 1949); *Feay* v. *Miller,* 31 N.W.2d 328 (S.D. 1948); *Southeastern Fair Ass'n* v. *Ford,* 14 S.E.2d 139 (Ga. 1941); *Goodyear Clearwater Mills* v. *Wheeler,* 49 S.E.2d 184 (Ga. 1948); *Freeman* v. *Myers, etc.,* 40 S.E.2d 365 (N.C. 1946); and *Dawson* v. *Fusco's Auto Service,* 17 S.E.2d 364 (Va. 1942); in which it was maintained that the relation of bailor and bailee did not exist. See, also, the comments that appear in 14 Stan. L. Rev. 200 (1961); 9 Baylor L. Rev. 220, 222 (1957); 24 Miss. L.J. 243 (1953); 16 Alb. L. Rev. 80 (1952); 24 St. John's L. Rev. 117 (1949); 47 Mich. L. Rev. 573 (1949); 30 Ky. L.J. 325 (1942); 37 Mich. L. Rev. 468 (1939); 14 B.U.L. Rev. 368 (1934); 18 Minn. L. Rev. 352 (1934); 12 Texas L. Rev. 347 (1934); 80 U. Pa. L. Rev. 1158 (1932).

The meager facts revealed by the record do not justify the finding that the relationship of bailor and bailee arose between the parties. It shows an absence of control over the parked vehicle on the part of the operator. As we have seen, appellant took his vehicle to the parking lot, rolled the windows up, locked it and kept the keys. No claim check was delivered to him for the purpose of redelivery. The parking area was not described nor its exits.[11] This being so, pursuant to the applicable law which we have stated his claim cannot prevail.

█ 2. It is necessary to clarify that the rule we have adopted refers exclusively to damages imputable to a third person, but not to damages caused by the negligence or carelessness of the operator or his employees. On this point you may see: *Metzger* v. *Downtown Garage Corp.,* 82 A.2d 507

---

[11] Although it has no special significance, appellant himself alleged in the complaint that he had "leased" a space to park his automobile.

(Pa. 1951); *Goldberg* v. *Kunz*, 45 A.2d 279 (1946); *Castorina* v. *Rosen*, 38 N.Y.S.2d 753 (1942); and especially the notes in 56 Dick. L. Rev. 351 (1952); 10 Md. L. Rev. 185 (1949), and 12 Fordham L. Rev. 178 (1943).

In view of the conclusion we have reached, it is not necessary to discuss the effect of posters plainly legible in visible places or of a printed notice on the claim check delivered to the customer exonerating the operator or limiting its liability. See, *Nargi* v. *Parking Associates Corp.*, 234 N.Y.S.2d 42 (1962); *Hallman* v. *Federal Parking Service, Inc.*, 134 A.2d 382 (D.C. 1957); *Parkrite Auto Park* v. *Badgett*, 242 S.W.2d 630 (Ky. 1951); *Allen* v. *Southern Pacific Co.*, 213 P.2d 667 (Utah 1950); *Sandler* v. *Commonwealth Station Co.*, 30 N.E.2d 389 (Mass. 1940); *U Drive & Tour, Limited* v. *System Auto Parks, Limited*, 71 P.2d 354 (Cal. 1937); and notes and remarks in 20 Wash. & Lee L. Rev. 362 (1963); 10 Baylor L. Rev. 216 (1958); 44 Ky. L.J. 233 (1956); 48 Mich. L. Rev. 1023 (1950); 8 U. Chi. L. Rev. 763 (1941); 22 Marq. L. Rev. 57 (1937); 14 B.U.L. Rev. 368 (1934); *cf. Cabrera* v. *Doval*, 76 P.R.R. 728 (1954); *Carrasquillo* v. *Am. Missionary Association*, 61 P.R.R. 837 (1942).

Nor is it necessary to discuss herein the applicable rules, even accepting the existence of a bailor and bailee relationship, when the loss of articles left in the parked automobile occur. See *Swarth* v. *Barney's Clothes, Inc.*, 242 N.Y.S.2d 922 (1963); *Service Parking Corp.* v. *Durr*, 162 A.2d 783 (D.C. 1960); *Hallman* v. *Federal Parking Services, Inc.*, 134 A.2d 382 (D.C. 1957); *Gariepy* v. *Chicago Service Parking Co.*, 112 N.E.2d 924 (Ill. 1953); *Parkrite Auto Park* v. *Badgett*, 242 S.W.2d 630 (Ky. 1951); *Palotto* v. *Hanna Parking Garage Co.*, 68 N.E.2d 170 (Ohio 1946). Annotation, *Liability of bailee for hire of automobile for loss*

*of or damage to contents*, 27 A.L.R.2d 796 (1953); 10 Baylor L. Rev. 216 (1958).

The judgment rendered by the Superior Court, San Juan Part, on August 7, 1963, will be affirmed.